Harry B. **HELMSLEY** and Alvin Schwartz, General Partners of a limited partnership, Trading as Horizon House Associates, Plaintiffs,

v.

**BOROUGH OF FORT LEE** et al., Defendants.

Civ. No. 1061–73.

United States District Court, D. New Jersey.

Aug. 7, 1973.

Sills, Beck, Cummis, Radin & Tischman by Arthur J. Sills, Jerald Baranoff, Newark, N. J., for plaintiffs.

Fuchs & Altschul by Robert Fuchs, Jersey City, N. J., Fredric W. Altschul, for defendant, Rent Leveling Bd.

McCarter & English by Armand Pohan, Newark, N. J., for defendants, Borough of Fort Lee, Mayor and Council.

## OPINION AND ORDER

LACEY, District Judge:

Plaintiffs, as owners of an apartment complex in Fort Lee, New Jersey, mount a multi-pronged constitutional assault upon that municipality's rent control ordinance.[1] They seek at this juncture preliminary relief enjoining enforcement of said ordinance. For the reasons hereinafter set forth, their application is denied.[2]

Plaintiffs are owners of a 1260-unit multiple dwelling complex, Horizon House, financed through the Federal Housing Administration (FHA) under the National Housing Act, 12 U.S.C. § 1702 et seq., and subject to the terms of a mortgage insurance contract issued by that agency. Defendants are public bodies and officials in Fort Lee who are charged with passage, implementation, and enforcement of the ordinance in suit. Jurisdiction of this Court is founded upon 28 U.S.C. § 1331.

In May, 1970 the FHA, pursuant to 12 U.S.C. § 1747(c), and on the basis of 1969 financial statements, approved a rent schedule for Horizon House.[3] All rents presently being paid by Horizon House tenants are at or within the FHA-permitted maximum.

The challenged rent control ordinance was adopted by the defendants Mayor and Council of Fort Lee on February 2, 1972, and became effective February 9, 1972.

A brief exposition of certain provisions of the ordinance will aid in understanding the issues of this controversy. Sec. 2 of the ordinance provides that at the termination of any lease, no landlord may request or receive a percentage increase in rent which is greater than the percentage difference between the Consumer Price Index 60 days prior to the expiration of the lease and the Consumer Price Index at the date the lease was

---

1. Ordinance No. 72–1, "An Ordinance to Regulate, Control and Stabilize Rents and Create a Rent Control Board Within the Borough of Fort Lee."

2. By order to show cause herein, plaintiffs obtained a temporary restraining order on July 18, 1973, precluding any enforcement at all of the ordinance in suit. On the return day, July 24, 1973, the restraint was vacated except as to the plaintiffs, the parties agreeing to its continuance as thus limited until further order of this Court.

3. Section 1747c provides:
 The Secretary shall require that the rents for the dwellings in any project insured under this subchapter shall be established in accordance with a rent schedule approved by the Secretary, and that the investor shall not charge or collect rents for any dwellings in the project in excess of the appropriate rents therefor as shown in the latest rent schedule approved pursuant to this section. Prior to approving the initial or any subsequent rent schedule pursuant to this section, the Secretary shall find that such schedule affords reasonable assurance that the rents to be established thereunder are (1) not lower than necessary, together with all other income to be derived from or in connection with the project, to produce reasonably stable revenues sufficient to provide for the payment of the operating expenses, the minimum annual amortization charge, and the minimum annual return; and (2) not higher than necessary to meet the need for dwellings for families of moderate income.

entered into with said tenant.[4] Under Secs. 5 through 9 there is provided a procedure for landlords to obtain additional rent increases by reason of an increase in property taxes. Sec. 10 states in pertinent part, as follows:

> Sec. 10. In the event that a landlord cannot meet his mortgage payments and maintenance he may appeal to the Rent Leveling Board for increased rental. The Board may grant the landlord a hardship rent increase to meet these payments. . . .
>
> The landlord may seek additional rental for major capital improvements or services. . . . .

Sec. 10 also details the procedure by which a landlord may make application for such increases.

Secs. 11 and 12 of the ordinance create the defendant Rent Leveling Board and delegate to said Board the power to hold hearings, adjudicate applications, issue and promulgate rules and regulations, and otherwise effectuate the purposes of the ordinance.

It is also provided that the powers granted to the Board "are exclusively advisory powers" and that "the action of said board shall not be deemed final until acted upon by the governing body of the Borough."

Under Sec. 13 both landlord and tenant may appeal the findings of the Rent Leveling Board to the governing body.

Sec. 15 prohibits any increases over the rent being received on February 2, 1972 "except for increases as authorized by this ordinance."

Shortly after passage of the ordinance, plaintiffs and others instituted a suit in the Superior Court of New Jersey, challenging its validity on several grounds. That court imposed temporary restraints against the enforcement of the ordinance pending formal argument. *See* Inganamort v. Bor. of Fort Lee, 120 N.J.Super. 286, 293, 293 A.2d 720 (Law Div. 1972). On June 26, 1972, Honorable Morris Pashman, then a Superior Court Judge and now a Justice of the New Jersey Supreme Court, dissolved the temporary restraints and in an elaborate and scholarly opinion declared the ordinance to be constitutional under the federal and state constitutions. Plaintiffs' appeal from this ruling went directly to the New Jersey Supreme Court on certification. On April 4, 1973, the Supreme Court sustained the ordinance as a valid exercise of the municipal police power and granted plaintiffs leave to pursue other and further challenges to the ordinance in the Superior Court.[5] *See* In-

---

4. The ordinance has been amended by Ordinance No. 73–26 replacing "60 days prior" with "90 days prior."

5. The New Jersey Supreme Court opinion dealt merely with the power of a municipality under state constitutional and statutory provisions to control rents. Judge Pashman's opinion, much more comprehensive, responded to eight separate arguments asserted by plaintiffs, including the claim that the field of rent control was here preempted by federal legislation, referring to the Economic Stabilization Act of 1970, P.L. 91–379, as to which Judge Pashman stated (120 N.J.Super. at 311–312, 293 A.2d at 733–734):

> . . . This act empowered the President of the United States "to issue such orders and regulations as he may deem appropriate to stabilize prices, rents, wages, and salaries at levels not less than those prevailing on May 25, 1970."

Pursuant to that authority, by Executive Order No. 11627, 12 U.S.C.A. § 1904 note, the President has promulgated a comprehensive scheme of controls over prices, rents and wages and delegated the administration of those controls to a Pay Board and Price Commission. The rules and regulations pertaining to rent are to be found in chapter III, part 300 of the Price and Rent Stabilization Regulations which became effective November 14, 1971, 1 U.S.Code Cong. & Adm.News, 335, 443–453 (January 18, 1972).

A detailed analysis of the rules and regulations of the "Phase II" program are not necessary in this case. Suffice it to say that they represent a comprehensive and emphatic concern by the Federal Government with the stabilization of rents. However, a review of the various rules and regulations indicates no intent to require exclusive enforcement of those provisions by the

ganamort v. Bor. of Fort Lee, 62 N.J. 521, 538, 303 A.2d 298 (1973). Plaintiffs then filed a notice of motion to restore the case, involving some contentions made herein as well, to the calendar of the Superior Court of New Jersey, Chancery Division, which motion was granted on July 27, 1973.

Even before the defendants' adoption of the challenged ordinance, however, plaintiffs were faced with a federal economic restraint upon Horizon House rents, namely, the Economic Stabilization Act of 1970 (Phase II). *See* note 5 *supra.* Three and five-year leases, as they expired after May, 1970, could be renewed under the FHA-approved schedule—until the commencement of Phase II, which prevented increases beyond 2½% per year, plus reimbursement of certain allowable costs. *See* Part III, Price Commission Regulations, CCH Economic Controls ¶ 3961 et seq.

Plaintiffs sought and obtained from Housing and Urban Development (HUD) an exemption from Phase II restraints, based upon what are referred to in the complaint as the project's "latest certified accounting statements".[6]

Price Commission. In Brookchester Inc. v. Matthews [118 N.J.Super. 565, 289 A.2d 275] *supra,* the Bergen County District Court recently exercised its jurisdiction over those regulations in the course of a summary dispossess proceeding. In that case it was held that an assertion that a landlord failed to comply with the rules and regulations of the Price Commission would constitute a defense to an action for possession based on the nonpayment of rent by the tenant.

[20] It is of course manifest that the municipalities of this State must comply with the comprehensive economic program set forth in Phase II. To that end, they are powerless to enact ordinances which contradict or conflict with its provisions. However, the ordinances under review in no way transgress the promulgated rules and regulations adopted pursuant to Phase II. Rather, they police the various enactments in a manner which is more stringent than the program itself. And, needless to say, any actions taken by the rent leveling boards and the governing bodies are subject to review by the Price Commission. See *e. g.* Price and Rent Stabilization Regulations §§ 301.106(d), 301.-108, U.S.Code Cong. & Admin.News, *supra* at 446–447.

[21] Plaintiffs claim that § 301.106(a), (c) of the aforesaid regulations prohibit the defendant municipalities from entering into the field of rent control. *Id.* Those regulations provide for exceptions to the guidelines established by the Price Commission in cases where a landlord is under the supervision of a local rent control program which had been in existence prior to November 14, 1971. Although enacted later, the provisions of the ordinances under review make no exceptions to the Price Commission guidelines.

Viewing the ordinances as consistent with the federal program, they cannot be said to contravene the Supremacy Clause of Article VI of the United States Constitution. Just as our courts may enforce the provisions of the federal enactments, so may our municipalities act consistently therewith. In view of the serious state of the nation's economy and the difficult and cumbersome task of administering anti-inflationary measures taken by the Federal Government, it behooves all branches of government, both state and local, to aid in the enforcement of those measures.

6. The Court on this motion has received from plaintiffs, in connection with this grant of exemption, certain HUD memos and correspondence, and a letter from the vice president of plaintiffs' managing agent, Mr. Lieberman, dated November 3, 1972, which states in pertinent part "that all leases that have been brought up to the May, 1970 schedule to date, are valid and authorized." As will hereinafter be discussed, this Court is unaware of the contents of the submission. It would appear from the materials provided that HUD was not advised of the interdiction on rent increases inherent in the Fort Lee ordinance of February 2, 1972; of the decision of Judge Pashman; or of the dissolution of the temporary restraints by Judge Pashman on June 26, 1972, when he sustained the ordinance's validity and application to plaintiffs. It would further appear that neither the defendants nor Horizon House tenants were given notice or an opportunity to be heard on plaintiffs' HUD application.

The HUD letter granting the exemption reads as follows:

> Reference is made to your request for an exception to the Price Commission regulations regarding the captioned HUD rent controlled housing in order to implement the approved rental schedule dated May 28, 1970 as well as to maintain financial feasibility for the projects.
>
> Based on the information submitted and the fact that the project is having financial difficulty, due to long term leases such as five years and three years, and the owner has been unable to implement the May 28, 1970 rent increases as approved, which was based on a 1969 financial statement, an exception is granted and you are authorized to implement the May 28, 1970 rent increase.
>
> This authorization is given with the condition that the unit rent established on FHA Form 2458 Rental Schedule dated May 28, 1970 is not to be exceeded and that tenants be given a thirty day written notice by management before the rent increase may be put into effect. *It is the understanding of HUD that the tenants can absorb this increase and that this will have no adverse effect on the housing market.* [emphasis supplied]

There is nothing to indicate how HUD arrived at its "understanding" that "the tenants can absorb this increase and that this will have no adverse effect on the housing market." Indeed a finding of "no adverse effect" is irreconcilable with the state of the Fort Lee housing market, if the prefatory statement of the challenged ordinance is credited.[7]

It is against this background that plaintiffs' complaint seeks a declaratory

judgment that the Fort Lee ordinance violates the federal constitution and an injunction against its enforcement, or, in the alternative, a declaratory judgment that the ordinance is inapplicable to plaintiffs.

The First Count of the complaint asserts that the assailed ordinance is unconstitutional under the Supremacy Clause. United States Constitution, Art. VI, cl. 2. The core of this contention is readily set forth by quoting the pertinent portions of the complaint:

> 16. Defendant, Rent Leveling Board, has commenced violation procedures against plaintiff for increases which said Board alleges are beyond those permitted by its Ordinance but which it knows and should know are explicitly permitted and approved by the FHA price schedule.
>
> 17. Hearings before the Rent Leveling Board on the aforesaid purported violations are to be held Wednesday, July 18th, 1973 . . . .
>
> 18. Federal policy as reflected in the National Housing Act and the decision of HUD that any diminution of plaintiff's rental schedules would jeopardize the solvency of plaintiff's project will be frustrated unless this Court shall declare the local law invalid or inapplicable.
>
> 19. Any reduction in rentals below that approved by the FHA will seriously impair the plaintiff's ability to meet the commitments to the Federal Government under their insured mortgage.
>
> 20. The local Ordinance is invalid and unconstitutional as applied to the plaintiff because being inconsistent with the Federal Regulations, it must fall under the Supremacy Clause of

---

7. The first paragraph of the ordinance reads as follows:

WHEREAS, the governing body of the Borough of Fort Lee does hereby declare that an emergency exists within the Borough of Fort Lee with respect to the rental of housing space in multiple dwellings not subject to rent regulation by reason of the demands for increases in rent which are determined by said government body to be exorbitant, speculative, and unwarranted and that such increases are causing severe hardships upon tenants and are adversely effecting the health, safety and general welfare of the citizens of the Borough of Fort Lee warranting legislative action by the governing body.

the United States Constitution (Article VI, clause 2).

21. The local Ordinance is invalid and unconstitutional because it seeks to legislate in a field already occupied and preempted by Federal legislation.

The Second Count of the complaint attacks the ordinance for its failure to provide for "a reasonable rate of return" on plaintiffs' investment, thereby taking private property without compensation "in contravention of the due process clause of the Fifth and Fourteenth Amendments . . . ." (Para. 3 of Second Count).

The complaint's Third Count asserts no constitutionally grounded claim. Instead it contends that the ordinance as originally adopted did not apply to Horizon House in that it exempted from the scope of its regulations all "buildings in which up to one-third of the occupied floor space is commercial. . . ." See Sec. 1(b) of ordinance, which did indeed thus provide. Inasmuch as all of plaintiffs' rental units in suit are undisputedly contained in buildings "where less than the requisite one-third of the occupied floor space is used for commercial purposes" (Para. 3, Third Count), plaintiffs contend that they cannot be in violation of the ordinance for having raised rents after February 2, 1972. In this connection plaintiffs also aver that their apartments were not covered by the ordinance until amendment thereof was published on June 28, 1973.

The Fourth Count alleges a deprivation of due process in that the Rent Leveling Board is currently composed of five persons, four of whom are tenants, and thus "cannot be fundamentally fair . . . ." (Para. 6 of Fourth Count).

The Fifth Count asserts that the ordinance's preamble falsely states the existence of a housing emergency in Fort Lee and that the definitional sections of the ordinance are vague and indefinite and lacking in sufficient standards.

■ It is well to review fundamental principles implicated by an application for a preliminary injunction. As this Circuit has repeatedly stated, a preliminary injunction should not issue except upon a showing that the party seeking this extraordinary relief will be irreparably injured pendente lite if his application is denied; that there is a reasonable probability of his eventual success on the merits; that in balancing the interests involved, the harm to his adversary's interests by the granting of a preliminary injunction is outweighed by that which will be sustained by him if such relief is withheld; and that the public interest favors granting the relief thus sought. Penn Galvanizing Co. v. Lukens Steel Co., 468 F.2d 1021, 1023 (3d Cir. 1972); Winkleman v. New York Stock Exchange, 445 F.2d 786, 789 (3d Cir. 1971); A.L.K. Corp. v. Columbia Pictures Industries, Inc., 440 F.2d 761, 763 (3d Cir. 1971); Mixing Equipment Co. v. Philadelphia Gear, Inc., 436 F.2d 1308, 1315 (3d Cir. 1971); United States Steel Corp. v. Fraternal Ass'n of Steelhaulers, 431 F.2d 1046, 1048 (3d Cir. 1970); Nelson v. Miller, 373 F.2d 474, 477 (3d Cir.), cert. denied, 387 U.S. 924, 87 S.Ct. 2042, 18 L.Ed.2d 980 (1967); Kontes Glass Co. v. Lab Glass, Inc., 373 F.2d 319, 320 (3d Cir. 1967); Ikirt v. Lee National Corp., 358 F.2d 726, 727 (3d Cir. 1966); Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, Inc., 268 F.2d 569, 573–574 (3d Cir. 1959); Warner Bros. Pictures, Inc. v. Gittone, 110 F.2d 292, 293 (3d Cir. 1940).

■ Under none of the counts of the complaint do plaintiffs show irreparable injury. It is clear from the allegations of the complaint that they have raised rents in conformity with the FHA–May 1970 schedule and without regard to the Fort Lee ordinance (See Para. 16, First Count and Para. 7, Third Count) and now fear "roll back" by the Rent Leveling Board. They do not allege that they have foregone rent increases because of the existence of the ordinance. Why then are they entitled to an injunction against the ordinance's enforcement?

Moreover, if plaintiffs have not raised all of their rents to the May, 1970 FHA schedule because of the restraints of the challenged ordinance, their position is not improved. Their posture almost immediately after February 2, 1972, was to institute the state litigation and obtain temporary restraints against enforcement of the ordinance as to Horizon House. Plaintiffs have never submitted to the Rent Leveling Board an application for an increase, not even after dissolution of the Superior Court restraints. Instead, appeal was taken only on narrow issues, apparently under appellate renewal of the restraining order, and with express reservation of other matters for later determination. Even after affirmance in the New Jersey Supreme Court of the decision of the Superior Court, no application for a rent increase was filed by plaintiffs with the Board. Instead, the matter has been moved again in the Superior Court and contemporaneously a temporary restraining order secured in this Court.

■ Plaintiffs claim to fear that the proceedings pending before the Board, and which were stayed by the temporary restraint herein, will result in diminished rents, which will never be recaptured—or recaptured only with great difficulty—if plaintiffs ultimately prevail on the merits. See Lieberman Affidavit, Para. 10. This argument suffers two basic flaws. First, this is not only not a convincing showing of irreparable injury—there is at this time no injury at all. Indeed, there may never be.[8] Second, even if the Board should advise that the challenged Horizon House rents are violative of the ordinance, and, assuming plaintiffs finally do file for but are denied an increase, the consequent injury is economic, readily measurable,

and compensable in money damages should plaintiffs ultimately prevail herein. A.L.K. Corp. v. Columbia Pictures Industries, Inc., 440 F.2d 761, 763 (3d Cir. 1971).

■ Nor does this Court find persuasive the spectre of multiple litigation painted by plaintiffs. I reject the assertion that suit would be necessary in each and every instance, or even in a substantial number of instances, because of tenant recalcitrance. Moreover, joinder of defendants (Fed.R.Civ.P. 20) and the class action device (Fed.R.Civ.P. 23) may be availed of in the event a substantial number of tenants refused to pay. Cf. Dorfmann v. Boozer, 134 U.S. App.D.C. 272, 414 F.2d 1168, 1173 n. 11 (1969).

■ Plaintiffs argue next, on the issue of irreparable injury, that the challenged ordinance, as they fear it will be applied to Horizon House, will jeopardize the solvency of the project and impair plaintiffs' ability to meet their FHA mortgage commitments. Aside from the prematurity of their concern, as hereinabove discussed, plaintiffs have not made a sufficient showing of such jeopardy. The ordinance contains a specific provision (Sec. 10) allowing a landlord to apply to the Rent Leveling Board for an increased rental if he cannot meet his mortgage payments. As has been stated, plaintiffs have not applied to the Board for such an increase, from which this Court can infer that their circumstances are not so necessitous as their general statements might lead one to believe. Moreover, plaintiffs, in support of their "solvency" arguments, offer no hard financial data. Reference is made only to financial statements nine months old; and absent are a mortgage pay-

---

8. Plaintiffs have not shown that there will be any injury. There is nothing before the Court to indicate that the rents permitted under the ordinance would differ from the rents plaintiffs are now charging, or from the rental schedule approved by FHA. Plaintiffs have not offered to the Court a comparison of how rents computed with reference to

the Consumer Price Index (pursuant to the ordinance) would differ from the rents they desire to charge. The fact is that until plaintiffs apply to the Rent Leveling Board for increases above the February, 1972 rents and are rebuffed, any claim of damage is purely speculative. See Druker v. Sullivan, 322 F. Supp. 1126, 1130 (D.Mass.1971).

ments schedule and a detailed analysis of plaintiffs' financial obligations to the FHA. There is no convincing evidence that present rent levels, or such increases as the ordinance would permit, are "lower than necessary" to produce sufficient monies to cover the operating expenses and other items set forth in 12 U.S.C. § 1747(c). *See* note 3 *supra*. From no papers heretofore submitted can it be determined what are, as of this time, and pursuant to § 1747(c), the "operating expenses", "minimum annual amortization charge", "minimum annual return", gross income, established investment, or other amounts relevant to a present determination of the project's financial status.

Accordingly, as to all the counts in the complaint, plaintiffs have failed to demonstrate irreparable injury and their application for preliminary injunctive relief is denied.

Plaintiffs' application fails on another ground as well. They have failed to demonstrate probability of success on the merits at final hearing.

■ Plaintiffs' First Count invokes the Supremacy Clause, which of course involves two considerations, one, "preemption", the other, "conflict".[9] *See* City of Burbank v. Lockheed Air Terminal Inc., 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973); Goldstein v. California, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973); Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); Hines v. Davidowitz, *supra*. Evaluation of such a claim makes apposite the following, from *Goldstein, supra*, 93 S.Ct. at 2312:

We must proceed to determine whether the challenged state statute is void under the Supremacy Clause. No simple formula can capture the complexities of this determination; the conflicts which may develop between state and federal action are as varied as the fields to which congressional action may apply.

I deal first with "preemption", mindful not only of the guidance of *Hines* (note 9 *supra*) but of Florida Lime & Avocado Growers, *supra*, where the Supreme Court stated (373 U.S. at 142, 83 S.Ct. at 1217):

> The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives.

> The principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained. See, *e. g.*, Huron Portland Cement Co. v. Detroit, *supra*. [362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852]

Plaintiffs claim that the provisions of the National Housing Act and regulations thereunder, by which plaintiffs' rent schedules were approved, establish a pervasive federal scheme which has occupied the field of rent regulation and precludes supplemental state or local legislation.

---

9. The Supremacy Clause provides as follows (Art. VI, cl. 2):

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Con-

stitution or Laws of any State to the Contrary notwithstanding.

The judicially developed dichotomy would bar state legislation in a substantive field Congress has clearly preempted, and, as well, state legislation which would "[stand] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed.2d 581 (1941).

As to "conflict", plaintiffs argue that the challenged ordinance conflicts with the federal scheme in that it threatens to defeat the purposes of the federal program by impairing plaintiffs' solvency and ability to meet its mortgage obligations under that federal program.

The next link in the chain of plaintiffs' "conflict" argument is that HUD's November, 1972 grant of exemption from Phase II was a recognition by that agency "with the authority and expertise to act in this area, [that] any diminution of rent levels within the project below that of the maximum schedule authorized by FHA in May, 1970, would impair the continued solvency of the project and of the mortgage commitment guaranteed by the Federal Government." Plaintiffs' Brief in Support of Order to Show Cause, p. 5. Plaintiffs then state (*Id.*, p. 6):

> The delicate balance effected between these often conflicting objectives first by FHA in 1970 in finding the Rental Schedule submitted as an approved maximum and then the action of HUD in 1972 in finding that the maximum could not be diminished by the inconsistent treatment of Phase II regulations establishes, we submit, a determination by the Federal government that no alternate or supplementary legislation by any level of government should be allowed to interfere with the payment to plaintiffs of any rentals which are secured in accordance with and at or below the level or schedule approved by FHA on May 28, 1970. For this delicate balance effected by the federal government can as easily be deleteriously affected by local action passed with the idea of supporting or supplementing one of the many

federal objectives as by action opposing all its aims. See Lockheed Air Terminal v. City of Burbank, 457 F.2d 667 (9th Cir., 1972), aff'd 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973).

A most recent Supremacy Clause pronouncement by the Supreme Court is in New York State Dep't. of Social Services v. Dublino, 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973):[10]

This Court has repeatedly refused to void state statutory programs, absent congressional intent to pre-empt them.

> If Congress is authorized to act in a field, it should manifest its intention clearly. It will not be presumed that a federal statute was intended to supercede the exercise of the power of the state unless there is a clear manifestation of intention to do so. The exercise of federal supremacy is not lightly to be presumed. Schwartz v. Texas, 344 U.S. 199, 202–203, 73 S.Ct. 232, 235, 97 L.Ed. 231 (1952).

Clearly the aligned state and federal enactments must deal with the same subject for Congress to be able to manifest an intent to supercede the state's exercise of its power in that area. This requisite is fatal to the plaintiffs' claim of preemption. The National Housing Act (including the FHA action thereunder) is not a rent control mechanism, and thus the field in which the challenged ordinance falls was not preempted.

In a strikingly similar context, involving a Supremacy Clause preemption claim based upon the juxtaposition of the National Housing Act and a New York City rent control ordinance, another court, in rejecting an application for a preliminary injunction, stated [Stone-

10. See note 5 *supra*, for Judge Pashman's treatment of the preemption issue as presented to him by plaintiffs in 120 N.J. Super. at 310, 293 A.2d 720. While the complaint and the moving papers therein have not been made available to this Court, it would appear that plaintiffs' argument was limited to the "preemption" aspect of the Supremacy Clause, and did not include the "conflict" argument as presented to this Court, fortified as it is by the application to HUD for exemption, and the granting thereof by that agency. We are not advised when the application was filed. The grant of course did not issue until November, 1972, well after Judge Pashman's decision.

ridge Apts., Co. v. Lindsay, 303 F.Supp. 677, 680 (1969)]:

> The ordinance deals with rent control pure and simple. It cannot conflict with federal legislation on this subject, since there is none. The only federal legislation relevant to the discussion is the National Housing Act, the subject matter of which, as indicated in Choy v. Farragut Gardens, 131 F.Supp. 609 (S.D.N.Y.1955), is unrelated to that of rent control.

It is because of the difference in subject matter that plaintiffs' reliance on *Lockheed, supra,* is misplaced. That case dealt with federal and local enactments in the same area of noise level of jet aircraft.

Thus it is inescapable that there has been no preemption.[11]

Nor do plaintiffs fare better on the "conflict" aspect of their Supremacy Clause argument.

 Their position that the HUD exemption is somehow a pronouncement that forecloses the ordinance's application is rejected. Indeed, this Court questions why HUD was not made aware of the state court proceedings or of plaintiffs' vigorous efforts to restrain enforcement of the ordinance; and why the defendants and tenants were not noticed on the HUD proceedings. Of what value is the HUD exemption when it is qualified as has been indicated?[12] Indeed, hearings before the Board may demonstrate tenants *cannot* absorb the increases, and that the rental market *is* affected by the exemptions.

On the other hand, accepting the plaintiffs' argument, the ordinance facially does not offer unavoidable conflict with the federal policy said to have been established by the HUD action. Sec. 10 thereof provides for a variety of increases which clearly are relevant to plaintiffs' insolvency and impairment arguments. Sec. 2 thereof enables Consumer Price Index increases to be obtained. Yet plaintiffs would imply that their rents are frozen by the ordinance, a contention belied by the plain language of the sections cited. It cannot be concluded, therefore, that on its face the ordinance is inconsistent, or in conflict, with the federal policies upon which plaintiffs rely.[13]

Appropriate is the following from *Stoneridge Apts., Co., supra,* 303 F.Supp. at 679–680:

> To the contrary, all that federal officials have stated is that the ordinance applies, as it does, to the extent that it is not inconsistent with applicable federal legislation, and that conceivably the ordinance may diminish plaintiff's ability to fulfill its obligations to the Federal Housing Administration. Should the ordinance operate at some future date to interfere with plaintiff's ability to perform its obligations to the FHA, it would, of course, have the right at that time to litigate the validity of the application of the ordinance to it.

Whether the Board impairs plaintiffs' ability to meet its FHA obligations, therefore, is still to be determined and must await administrative exhaustion.[14]

---

11. *See* HUD letter of May 11, 1973, to counsel for the Rent Leveling Board: "The Department has adopted the position that the regulation of landlord-tenant relations in federally assisted housing projects is not preempted by Congressionally enacted legislation, because the goals of local regulation may fulfill otherwise neglected needs and are not necessarily inconsistent with federal regulations. . . ."

12. *See* pp. 585–586, *supra.*
Plaintiffs' argument would be far more impressive had HUD, presented with the

local ordinance, expressly deemed it inoperative.

13. "Impairment" is not the only constituent of the alleged "federal policy," however. Sec. 1747(c) of 12 U.S.C. also provides that rents should not be "higher than necessary to meet the need for families of moderate income."

14. McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), cited by plaintiffs to excuse them

*See* Stoneridge Apts. Co. v. Lindsay, *supra*, 303 F.Supp. at 680; Druker v. Sullivan, 322 F.Supp. 1126, 1130 (D.Mass.), later opinion, 334 F.Supp. 861 (D.Mass. 1971), aff'd, 458 F.2d 1272 (1st Cir. 1972).

Thus, as to the First Count of the complaint, plaintiffs have failed to show a likelihood of success on the merits.

The same is true on the Second Count, wherein plaintiffs allege a substantive due process deprivation said to be inherent in the ordinance's failure to provide for a reasonable rate of return on plaintiffs' investment.

 This Court is unable to conclude that the ordinance does not lend itself to a construction which recognizes a right to a reasonable rate of return on investment.[15] For example, Sec. 2 enables the Board to grant increases in accordance with increases in the Consumer Price Index. *See* Aranow affidavit, paras. 6–7 and accompanying charts indicating increases available under Sec. 2 up to 29% for five-year leases and up to

18% for three-year leases. *See also* Judge Pashman's statement in *Inganamort, supra*, 120 N.J.Super. at 326, 293 A.2d at 742:

> The ordinances under review have ample provisions for justifiable increases in rentals so that an owner of an apartment will receive a reasonable return on his investment . . . .[16]

This Court's analysis would lead it to a rejection of plaintiffs' claim, were it necessary to reach a determination now. However, in view of the fact the parties are in state court presently, and particularly in the light of the just quoted views expressed by Judge Pashman, it appears that it might be appropriate for this Court to abstain from deciding this issue until a definitive construction of the ordinance is achieved in the state court. Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L. Ed.2d 196 (1971); Reetz v. Bozanich,

from submitting their case to the Board, is inapposite. Exhaustion of state administrative processes may not be required in the civil rights *McNeese* context. Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967.) Plaintiffs have not otherwise shown sufficient cause to forego the exhaustion requirement. *See* Gibson, *supra*, 93 S.Ct. at 1696 n. 14 for grounds upon which a federal court will deem state administrative remedies inadequate.

15. Indeed, it is a court's duty to recognize a fair construction of a statute that will avoid a constitutional question; United States v. Thirty-Seven Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932), and to construe legislation whenever possible so as to preserve its constitutionality. United States v. Vuitch, 402 U.S. 62, 70, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971); Tilton v. Richardson, 403 U.S. 672, 684, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971);

NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893 (1937).

16. Since Judge Pashman was not ruling on the question as here presented, I do not consider this language, together with the New Jersey Supreme Court's affirmance, as a construction of the ordinance which is binding on this Court. *See* Groppi v. Wisconsin, 400 U.S. 505, 507, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971). This question is presently pending in Superior Court. The quoted language, however, is helpful as an indication of the likelihood that a state construction of the ordinance would obviate the constitutional question.

*But see* Acting Justice Conford, dissenting in *Inganamort, supra*, 62 N.J. at 545, 303 A.2d at 311, who, in dictum, refers to an absence of any provision in the ordinance which would "assure an owner a right of fair operating return on his investment" and labels it a "patent apparent" deficiency, but who also states (62 N.J. at 545 n. 2, 303 A.2d at 311) that "[t]he points not having been argued, I do not purport here to be passing upon the validity of any of these ordinances."

397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970); Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941); Conover v. Montemuro, 477 F.2d 1073 (3d Cir. 1972), *reinstated en banc in pertinent part* (May 8, 1973). Additionally, if this Court abstains, the Board itself will have an opportunity to manifest its own construction as landlords submit to it applications for increases. *See* Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). The action it thus takes may lend guidance to any subsequent judicial construction that is sought. *But cf.* Brennan v. Corning Glass Works, 480 F.2d 1254 (3d Cir. 1973). Although the abstention question can be settled at a later date upon briefing by the parties, it is presently clear that the Second Count furnishes no basis for preliminary injunctive relief.[17]

▮▮▮ The Third Count, as has been indicated previously (p. 587 *supra*), asserts no constitutional or federal statutory claim, but merely asserts that the

ordinance does not apply to plaintiffs. I am not told why this claim was not raised previously in the state litigation. It affords no basis for preliminary injunctive relief from this Court. Jurisdiction under 28 U.S.C. § 1331 is lacking, though pendent jurisdiction might, upon proper showing, and in the exercise of this Court's discretion, preserve this count for final determination. United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Hopefully this issue will be presented in the state court litigation and there resolved.[18]

▮▮▮ In the Fourth Count of the complaint plaintiffs, claiming a Due Process deprivation, allege that the composition of the five-member Rent Leveling Board is fundamentally unfair, in that it is heavily tenant-weighted, and that the ordinance is invalid because it fails to provide landlord representation. It is not alleged that any of the Horizon House tenants sit on the Board, or that the Board members will be sitting in judgment on their own rents.[19] This

---

17. Of course, certain circumstances, if proved to exist, justify rent regulations though they may fail to guarantee a landlord a fair rate of return. *See* Teeval Co. v. Stern, 301 N.Y. 346, 93 N.E.2d 884, cert. denied, 340 U.S. 876, 71 S.Ct. 122, 95 L.Ed. 637 (1950); *and see* Bowles v. Willingham, 321 U.S. 503, 518, 64 S.Ct. 641, 649, 88 L.Ed. 892 (1944), where Justice Douglas, writing for the Court, stated:

A member of the class which is regulated may suffer economic losses not shared by others. His property may lose utility and depreciate in value as a consequence of regulation. But that has never been a barrier to the exercise of the police power. L'Hote v. New Orleans, 177 U.S. 587, 598 [20 S.Ct. 788, 792, 44 L.Ed. 899]; Welch v. Swasey, 214 U.S. 91 [29 S.Ct. 567, 53 L.Ed. 923]; Hebe Co. v. Shaw, 248 U.S. 297 [39 S.Ct. 125, 63 L.Ed. 255]; Pierce Oil Corp. v. City of Hope, 248 U.S. 498 [39 S.Ct. 172, 63 L.Ed. 381]; Hamilton v. Kentucky Distilleries Co., 251 U.S. 146, 157 [40 S.Ct. 106, 108, 64 L.Ed. 194]; Euc'id v. Ambler Realty Co., 272 U.S. 365 [47 S.Ct. 114, 71 L.Ed. 303]; West Coast Hotel v. Par-

rish, 300 U.S. 379 [57 S.Ct. 578, 81 L.Ed. 703]. And the restraints imposed on the national government in this regard by the Fifth Amendment are no greater than those imposed on the States by the Fourteenth. Hamilton v. Kentucky Distilleries Co., *supra*; United States v. Darby, 312 U.S. 100 [61 S.Ct. 451, 85 L.Ed. 609].

18. It is incomprehensible that plaintiffs would have litigated the issues as to the ordinance's constitutionality under the federal and state constitutions and not have deemed the ordinance applicable to it. It is apparent to this Court that to read literally the definition of "Dwelling" in Sec. 1 of the ordinance, which exempted "Buildings in which up to one third of the occupied floor space is commercial", would call for exempting every apartment house. The obvious purpose of the ordinance, as expressed in its preamble and operative sections, is to the contrary and calls for judicial substitution of the words "over" or "more than" for the words "up to." It is noted that this error was corrected by Amendment on July 11, 1973.

19. *Compare* Gibson v. Berryhill, *supra*.

Court is not prepared to say, on the basis of these allegations alone, that plaintiffs have suffered Due Process deprivation. Nor is this Court prepared to predict that plaintiffs, should they seek an increase, will be harmed irreparably by the actions of a Board which is controlled by standards set forth in the ordinance, and whose advisory actions are subject to review by the governing body under Sec. 13, and by the state courts. Thus as to this count as well, plaintiffs have failed to show a likelihood of success on final hearing.

 Finally, plaintiffs challenge the ordinance's declaration of an emergency in the Borough with respect to rental of housing as inadequate to justify the challenged exercise of the police power, and that the ordinance is thus a taking of plaintiffs' property without due process. Plaintiffs also attempt to rebut the existence of a housing emergency by offering a rent survey which we are told was before the New Jersey Supreme Court in *Inganamort*.[20]

A similar attack was made in *Stoneridge, supra,* upon the New York City rent control ordinance, which had also declared a housing emergency to exist. The court there rejected the challenge, stating that it has long been settled that, given such a declaration, there is no unconstitutional taking under the fifth amendment, at least until proved groundless. 303 F.Supp. at 680, and cases there cited. Moreover, to succeed in their challenging of the emergency declaration, plaintiffs must overcome the presumption of the ordinance's validity. Inganamort v. Borough of Fort Lee, 120 N.J.Super. at 297, 293 A.2d 720, aff'd, 62 N.J. 521, 303 A.2d 298 (1973). Plaintiffs have not carried this burden

in submitting results of the survey of the occupancy rates in the Borough conducted by Mr. John Inganamort on March 2, 1973. This survey concludes that there then existed a vacancy rate in the Borough of 6.67% which, plaintiffs allege, is not an emergency under the rulings of the New Jersey Supreme Court. This survey lists 34 apartment complexes in the Borough and states the total number of units vacant for each complex. Close analysis reveals there are included three complexes with an excessively high number of vacancies compared with the other complexes. One is listed with a vacancy rate of over 50%. No information is offered to explain these variances. Inclusion of these units without further explanation appears to distort the true rental situation. A significant number of the complexes in the listing contain no vacancies (16/34) while 26 of the 34 listings contain no more than three vacancies each. Elimination of the three deviant complexes above described results in a vacancy rate of 2.2% in the Borough, which appears to reflect more accurately the picture presented by the survey. Regardless of the actual vacancy rate, it is sufficient to indicate that the Inganamort survey does not rebut the declaration of emergency contained in the ordinance so as to warrant a finding of a likelihood of plaintiffs' success on the merits. Parenthetically, it is noted that this question is also presently pending in state court and will be resolved there on this round of litigation.

 Applying the remaining tests involved in the determination whether to grant a preliminary injunction application, the "balancing" test and the public interest test (*see* p. 587 *supra*), these too resolve themselves in defendants' favor.

20. The opinion of the New Jersey Supreme Court, 62 N.J. at 527, 303 A.2d at 301, provides:

We must assume there is a critical shortage of the housing covered by the several ordinances here involved and that tenants, trapped by the fact, are being exploited. The judgments were entered on pretrial motions in which

this factual premise was not challenged. Hence we have the naked legal issue whether the police power delegated to these municipalities includes the power to deal with the evil of inordinate rent arising out of a housing shortage.

This Court is not told why "this factual premise was not challenged."

Based upon the foregoing findings in this opinion, it is apparent that plaintiffs will sustain less loss or injury (if they sustain any) if the injunction is denied than will defendants if the injunction is granted. The public interest too is better served by a denial of the relief sought. Cf. Ronson Corp. v. Liquifin Aktiengesellschaft, 483 F.2d 846 (3d Cir. 1973).

Accordingly, and for the foregoing reasons, it is ORDERED that plaintiffs' application is denied and all restraints are vacated.

The foregoing constitutes this Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).